IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

RONALD B. GRAY,     *
    Plaintiff,     *
     *      **Case No. 3:18-cv-00045**
     *
ANDRIA MAYBERRY; MYA KAY     *
DOUGLAS; and THE TMG FIRM, LLC,     *
    Defendants

### DEFENDANT ANDRIA MAYBERRY'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S DEMAND FOR RESPONSE TO INTERROGATORIES

Comes now Andria Mayberry, Defendant in the above-styled matter and pursuant to Federal Rules of Civil Procedure Rule 33, and hereby responds to Plaintiff's demand for Defendants' response to the interrogatories and states the following:

### GENERAL OBJECTIONS

**1.**

Defendant objects to each request to the extent that it purports to require the release of information which is protected by the attorney-client privilege, the attorney work product doctrine, is prepared in anticipation of litigation or trial by or for a party of for that party's representative, or is otherwise protected by any other discovery privilege recognized under the Federal Rules of Civil Procedure or the laws of the State of Georgia.

2.

Defendant objects to each request to the extent that it purports to impose a duty or obligation upon Defendant that is not imposed by the Georgia Civil Practice Act.

3.

Defendant objects to each request to the extent that it purports to require Defendant to identify each document which is responsive to a request when documents are produced as they are kept in the ordinary course of business. Such a requirement is unduly burdensome, and Plaintiff may not impose that requirement pursuant to the Georgia Civil Practice Act.

4.

Defendant objects to each request to the extent it requires Defendant to provide information that may be obtained by Plaintiff from another source that is more convenient, less expensive, or less burdensome.

5.

Defendant objects to each request to the extent that it is vague, ambiguous, overly broad, unduly burdensome, oppressive, or impossible to answer fully.

6.

Defendant objects to each request to the extent that it seeks information that is confidential or which is not relevant to the subject matter involved in the pending action and is not reasonably calculated to lead to the discovery of admissible evidence.

7.

Defendant objects to each request to the extent that it seeks confidential, proprietary, or trade secrets information from Defendant.

8.

Defendant objects to each request to the extent that the information sought is the subject of continuing investigation by Defendant.

9.

Defendant objects to each request to the extent that it seeks information that is protected by patient confidentiality, Peer Review Privilege, O.C.G.A. § 31-7-133, or the Medical Review Committee Privilege, O.C.G.A. § 31-7-143.

10.

Defendant objects to each request to the extent that it calls for the disclosure of information outside the scope of the time, place, subject matter, and circumstances of the occurrences mentioned or complained of in the Complaint.

11.

Defendant objects to each request to the extent that Defendant does not describe the documents to be produced by item or category and that each item or category to be produced, to the extent any item or category of documents is described, is not described with reasonable particularity. Defendant further objects on the grounds that   To answer each request would result in annoyance, embarrassment, or oppression and/or deterioration of mental state of Defendant, and WITHOUT WAIVING THE FOREGOING, DEFENDANT RESPONDS AS FOLLOWS:

1.

Are you aware of the penalty for perjury in a Federal Court?

**Defendants Response: I know that you can't lie, so I guess yes!**

2.

You stated in the book Before Empire: Raising Brys'here Yazz The Greatest Gray (hereafter "book"), that you were seven months pregnant and carrying Plaintiffs son when he brutally assaulted you. After the alleged assault, when did you go to the hospital to have the baby checked? Can you present. any evidence stating that you were hospitalized regarding this alleged incident?

**Defendant's Response: After the assault I didn't go to the doctors right away because I was scared. Once I went with contractions, they stopped them. Later that week I went back I had my son two or three weeks after the assault, he was born two weeks early.**
**Defendants Response: No I wasn't hospitalized, because he threatened to kill me if I went to the hospital, so my mother and step father took me to the police station for a TRO.**

3.

You stated in the aforementioned book that the assault induced your labor. Was that medically assessed by a doctor'? Who came to that medical conclusion?

**Defendants Response: The doctor stated the trauma I had experienced along with the stress of the situation of being beaten, that this is what induced my labor two weeks early. The attending doctor informed me that this was the reason. This was twenty-seven years ago so I do not remember the doctor's name.**

4.

Do you have any documents from the hospital relating to questions #2 and #3 above?

**Defendants Response: No, I do not have any of these in my possession, it was 27 years and hospitals have since gone to electronic storage. The hospital was named Chestnutt Hill, in PA. I'm in the process of submitting a medical records request from Chestnutt Hill, we will supplement this response upon receipt of that information, if it is available.**

5.

When you were going into labor, who transported you to the hospital?
Was Plaintiff present at the hospital with you in the delivery room?
Was there anyone else from your family there?

**Defendants Response: When I went into labor, I drove myself to the hospital. The Plaintiff was present in the hospital in the delivery room, and no one from my family was there because my mother had my daughter. They only allowed one person, in the room and I felt safe with the doctors and nurses, so I did not mind him being in attendance for the birth of his son.**

6.

When you arrived at the hospital, how long did it take for you to deliver your son?

**Defendants Response: Maybe six hours, although I am not sure of the exact amount of time it took for him to be born.**

7.

You stated in the book that Plaintiff allegedly assaulted you inside his room, that the door was locked. and his mother and grandmother were trying to open the door after hearing your loud screams for help, but they were unable to open the door. Did the door finally unlock?
Who unlocked the door? When the door unlocked, were Plaintiffs mother and grandmother present in the house? Are you aware of the second door into the room?

**Defendants Response: Ronald unlocked the door. His mother and grandmother were present in the house. I begged him to go to the bathroom over and over and he finally**

agreed. His grandmother's room was next door to the bathroom, and she heard me crying after I saw what he had done to my face. She actually asked him what he had done to me and started to curse him out. There was no second door in the room. I don't even remember him having a closet.

8.

You stated that your mother came to Plaintiffs house and escorted you out. How did she get into the house?

**Defendants Response: My mother was invited into the home by Mr. Gray's grandmother who then informed her of my location within the home.**

9.

You stated in the book that your face was brutally beaten and deformed and your front tooth missing. Do you have any medical documentation to support these incriminating allegations?

**Defendants Response: I have documentation of the TPO that was given to me once the judge saw my face brutally beaten. I have since repaired my front tooth and now have a cap on my front tooth.**

10.

You stated in the book that the alleged assault caused your son to acquire ADHD (attention deficit hyperactivity disorder). Was that evaluated and concluded by a doctor? Where did you get that information?

**Defendants Response: I stated in the book that the doctor stated that my son could have ADHD due to a chemical imbalance caused by the trauma I experienced,**

11.

After the alleged assault, did you inform police? Did you talk to Plaintiffs family?

**Defendants Response: He assaulted me a number of times, while pregnant and right after I got out of the hospital. After the assault in question I did not call the police, the neighbors (Rodney and his friends) actually helped me. They pulled him off me and they had a conversation with him. After that he did not bother me anymore as far as trying to put his hands on me. I did talk to his mom about it because she had heard the incident had taken place and of course she wanted to know what was going on. Later on, his daughter asked me about it and I told her the truth as she had heard about the abuse I experienced and heard her mom experienced the same thing.**

12.

Did you state to Plaintiffs daughter Amber Holt that you are just trying to get your ratings up by publishing this information?

**Defendants Response: No this is not true.**

13.

Were you relatively close to Plaintiffs mother until her demise in November 2011 ?

**Defendants Response: Yes, I was relatively close to his mother before her death. I was there when she died, our relationship comprised of her basically telling me that even though I was having his baby that I needed to get away from him. She was the one who told me he was schizophrenic and about Amber's mother; the fact that she too was pregnant with his baby and that she also experienced his abuse.**

14.

Is your son Blyshere Gray speaking on your behalf in regard to this matter?

**Defendants Response:**

**My son is not speaking on the matter of the abuse I suffered at the hands of the Plaintiff. My son only wrote the foreword to the book; therefore he is not speaking at all. My son can speak for his attempted abuse by his father.**

15

Was the book written about raising Bryshere Yazz The Greatest Gray?

**Defendants Response: The book is about raising Bryshere from my experiences with dealing with, domestic violence, his ADHD, and how I navigated through the school system by learning to be his advocate. The book is meant to inspire parents to be there for their children. It provides resources, explains IEP's, management skills and surviving depression.**

16.

From 1-18 years of age did Bryshere Gray visit Plaintiffs mother on weekends, birthdays, and holidays?

**Defendants Response: Yes, they had a relationship. It was not ever year, the visits were few and far in between, I would say he spent one day at a time with his grandmother. Any other time the visits were very sporadic, I cannot say holidays, I would take him he would spend time and we would leave.**

17.

Do you have any witnesses who can attest to this alleged brutal assault that took place in 1995 at Plaintiffs house?

**Defendants Response: The incident didn't happen in 1995. It happened in 1993. Nobody "witnessed" the incident because the door was locked, but they heard the abuse of the incident taking place. His mom was banging on the door and his mom and grandma was screaming, "Ronald open the door why do you have her locked in there".**

18.

Did anyone see your face after the alleged assault? If so, who?

**Defendants Response: My mother saw my face after the assault, and she took me to get a TPO. My stepfather and his grandmother saw my face. The judge that issued my first TPO saw my face as well which prompted its issuance. My girlfriend, Tameka Carrol also saw my face. She has memories of the incidents of abuse I suffered at the hands of the Plaintiff.**

19

What did the doctors say about your face when you spoke to them after the alleged assault? Can you provide any medical evidence to substantiate this?
**Defendants Response: I was threatened that if I told or went to the hospital that he (Ronald) would kill me. I do not readily have medical documentation available.**

20

Why did you wait twenty years to state these allegations against Plaintiff by publishing it in a book?

**Defendants Response: The book is a memoir; it is about my life and my experiences within my life. It was like therapy in that I had repressed these memories for quite some time, in and out of therapy for the past 27 years. This book chronicles my strength n=and willingness to overcome.**

21

Were you Bryshere's manager?

**Defendants Response: I was Brysher's manager, yes from the time he forst started in his careers and for quite some time afterward.**

22

Are you still managing Bryshere?

**Defendants Response: No, I am not.**

23

Are you making a profit from the sales of the book?

**Defendants Response: No not exactly. I have spent more trying to get the published than I have gained in sales. The sales were not the main objective, it was only to get my story out, of how I overcame the obstacles of my life.**

24

Were you upset that you were pregnant along with another woman by Plaintiff?

**Defendants Response: No, not at all. I didn't know she was pregnant until after I was in a relationship with Ronald. I only knew Ronald for three to four months before I got pregnant so I didn't know a lot about him because I was young. I was not aware she was pregnant until his mother told me, and by that time I was already pregnant as well.**

25

Can you provide the amount of time that elapsed between the alleged assault and the delivery of the baby?

**Defendants Response: After the assault I was going through Braxton Hicks contractions brought on the stress and trauma I was experiencing at the hand of the Plaintiff. Those were stopped when you went to the hospital and I delivered him about two to three weeks later.**

Respectfully submitted this 11th day of August, 2020.

                                          J. WALKER & ASSOCIATES, LLC

                                          By: */s/James L. Walker, Jr.*
                                                  James L. Walker, Jr.
                                                  Georgia Bar No. 260643

3421 Main Street | Suite A
Atlanta, GA 30337
Phone: (770) 847-7363
jjwalker@walkerandassoc.com
*Counsel for Defendant Mayberry*